**2024 UT App 169**

# THE UTAH COURT OF APPEALS

SARA WARD,
Appellant,
*v.*
MEREDITH MCGARRY,
Appellee.

Opinion
No. 20230365-CA
Filed November 15, 2024

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 134901200

Angilee K. Dakic, Attorney for Appellant

Julie J. Nelson, Martin N. Olsen, and Beau Olsen,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     This case involves a child support award in a paternity action. In an earlier appeal of this case between Sara Ward and Meredith McGarry, this court vacated the district court's child support award and remanded the matter to the district court for additional factual findings. *See Ward v. McGarry*, 2021 UT App 51, ¶ 12, 491 P.3d 970. Following a three-day trial on remand, the district court entered a new order awarding child support. Ward now appeals that award, arguing it was improper for multiple reasons. In addition, Ward challenges the court's decision not to sanction McGarry. For the reasons set forth below, we affirm the district court in all respects.

BACKGROUND

*The Prior Appeal*

¶2      Ward and McGarry have one child together. The two have been involved in a paternity action regarding that child since 2013. Although they have resolved custody issues relating to the child, they were unable to reach an agreement regarding child support. Ward has continuously complained that McGarry has refused to provide a complete financial disclosure and verification of his income. At one point, the parties engaged in settlement negotiations and exchanged settlement offers pursuant to rule 68 of the Utah Rules of Civil Procedure. Ultimately, the parties were unable to reach an agreement.

¶3      Thereafter, in March 2020, the parties appeared before a domestic relations commissioner to address various non-dispositive motions then pending before the court. The commissioner did not address these motions, however, and instead entered an order captioned "Final Order Re Child Support," wherein the commissioner imputed McGarry's monthly income at $30,000 and recommended that McGarry pay Ward child support arrears and attorney fees and costs. Ward objected to the commissioner's recommendation, but the district court summarily denied the objection and countersigned the commissioner's recommendation, making it the final order of the court.

¶4      Ward appealed, arguing that "the district court erred in approving the commissioner's recommendation and summarily denying her objection without adequate findings and without a trial or other evidentiary hearing." *Ward v. McGarry*, 2021 UT App 51, ¶ 6, 491 P.3d 970. We agreed with Ward and accordingly vacated the court's order and remanded the matter for further proceedings. *Id.* ¶ 12. On remand, the district court conducted a three-day trial to determine the parties' incomes for purposes of

calculating child support and to address other issues, including Ward's request for sanctions.

*The Trial*

¶5 McGarry is self-employed at Iron Mountain, LLC (Iron Mountain), a construction company that he partially owns. Ward is employed at a bank. Given the nature of the parties' employment, the bulk of the trial was devoted to determining McGarry's income.

¶6 To that end, during the course of the trial, McGarry testified on his own behalf, called multiple witnesses, and introduced documents—including his 2020 tax return, which was the last available return at the time of trial—as evidence. Based on the evidence presented, Ward argued in closing that the district court should calculate McGarry's income by starting with the income listed on his tax return and then "add[ing] back" three things that should not have been deducted from gross receipts: (1) McGarry's wife's (Wife) salary from Iron Mountain; (2) Wife's distribution from McGarry Land and Livestock, Inc. (McGarry Land);[1] and (3) ranching losses and additional depreciation related to a ranch in Idaho (the Ranch) purchased by Iron Mountain.

¶7 In its written ruling issued after the trial, the district court first declined Ward's request to add back to McGarry's income the three things she proposed should be included. The court made specific factual findings addressing each component of Ward's

---

1. McGarry Land is a holding company that owns 25% of Iron Mountain. McGarry Land is owned equally by McGarry and Wife. Thus, Wife's distribution from McGarry Land represents a 12.5% ownership interest in Iron Mountain. And because Wife and McGarry are equal owners of McGarry Land, McGarry's ownership interest in Iron Mountain is the same as Wife's—12.5%.

proposed formula and explained why it had elected not to add these things back. Then, the court calculated McGarry's income using his 2020 tax return. That return showed that McGarry received a $52,000 salary from Iron Mountain and a $167,406 distribution from McGarry Land (flowing from a 12.5% ownership interest in Iron Mountain). Based on this, the court determined that McGarry's yearly income was $219,406, or $18,284 per month.[2]

¶8 After making this determination, however, the district court announced that it was not setting McGarry's monthly income at $18,284 but that it would instead impute McGarry's monthly income at $32,318 per month. The court reached this higher amount by accepting a proposal put forth by McGarry during the trial to include Wife's distribution from McGarry Land in his income (thus including the entire distribution from Iron Mountain rather than the half of that distribution the court determined McGarry was entitled to). The court made clear that "but for [McGarry's] agreement to count [Wife's] distribution, [it] would not have counted that income," but it concluded that it would accept McGarry's imputation because the court would "not interfere with [McGarry's] decision to accept an imputation of income that [was] *well in excess* of that which [was] found by the Court." (Emphasis added.)

¶9 Because Ward's appellate challenge primarily involves the district court's factual findings concerning the three things she unsuccessfully argued the court should add back to calculate McGarry's income, we summarize the evidence presented at trial as well as the court's corresponding factual findings related to each of those things.

---

2. All dollar amounts have been rounded for convenience.

*Wife's Salary from Iron Mountain*

¶10 McGarry's brother (Brother), who is currently the majority shareholder of Iron Mountain as well as its chief executive officer, testified that Wife is an employee of the company. As an employee of the company, Wife earns a yearly salary in the same amount as McGarry, which was $52,000 in 2020.

¶11 McGarry likewise testified that Wife is employed by Iron Mountain. He explained that although Wife is a full-time employee of a local school district, she is also "an officer of [Iron Mountain], and she helps [him] with [his] office work," while he is "out in the field most of the time." Wife's W-2 from 2020 was admitted along with McGarry's W-2 from that same year. The documents showed that Wife's salary from Iron Mountain that year was the same as McGarry's.

¶12 Based on this evidence, the district court found that Wife "is substantially and separately employed by Iron Mountain and that her compensation will not be attributed to [McGarry]."

*McGarry's Effective Ownership Interest in Iron Mountain*

¶13 McGarry testified that he founded Iron Mountain in 2003 with his ex-wife, who he was then married to. At the time Iron Mountain was formed, McGarry and his ex-wife each owned a 50% share of the company. A few years later, in 2006 or 2007, McGarry and his ex-wife relinquished 50% of the company to Brother, thus leaving McGarry and his ex-wife 50% of the company. In 2012, McGarry and his ex-wife divorced. Pursuant to their divorce decree, the value of Iron Mountain was divided equally between McGarry and his ex-wife. This division was ultimately accomplished through an equalization payment; McGarry was granted the entire 50% ownership interest in Iron Mountain, and he was ordered to pay his ex-wife $150,000 in equalization.

¶14 McGarry testified that his divorce greatly impacted him financially. In 2013, after his divorce had been finalized, McGarry and Brother "discussed" a proposal for Iron Mountain to assume McGarry's equalization debt. McGarry explained that under this proposal, Iron Mountain would assume his equalization payments in exchange for half of his 50% interest in the company. As part of the deal, Brother would gain the option to purchase these shares by forgiving the amount owed to him for the equalization payments made by the company. That option was to remain "through [2015], when the equalization was final." Brother exercised the option and purchased half of McGarry's shares, leaving McGarry with 25% of Iron Mountain and Brother as the majority shareholder.

¶15 Brother's testimony on the subject was consistent with McGarry's. Brother testified that he first began working for Iron Mountain "around 2008." At the time he joined the company, he was a 50% owner. Brother explained that the ownership percentages shifted when he "exercised an option to buy an additional 25 percent of the company" from McGarry. Although Brother did not remember "the exact year" the transfer had occurred, he testified that in "November or December of 2012," he and McGarry made an agreement that Brother would have the option to purchase half of McGarry's shares. However, at the time the option was formed, Brother was not allowed to exercise it. When Brother was eventually allowed to exercise the option, he chose to do so, leaving McGarry with 25% of Iron Mountain. Iron Mountain's corporation documents, which were entered into evidence at trial, reflect that the change in ownership took place in 2016.

¶16 Lastly, the district court heard testimony regarding McGarry Land. McGarry testified that all the distributions from Iron Mountain are paid directly to McGarry Land and then distributed equally between McGarry and Wife.

¶17   The attorney who drafted McGarry Land's articles of incorporation testified that the company "became an entity" in August 2016. The attorney explained that it is "strictly typical" for larger companies to create holding companies because they provide "a lot of advantages," including "tax advantages" and "liability protection."

¶18   Based on the foregoing evidence, the district court calculated McGarry's effective ownership of Iron Mountain at 12.5%, finding as follows:

> [McGarry Land] is a holding company that is owned exclusively by [McGarry] and [Wife]. [Iron Mountain], in turn, is owned 75 percent by [Brother] . . . and 25 percent by [McGarry Land]. [McGarry] and [Wife] each own 50 percent of [McGarry Land].

The court made a separate finding specifically addressing the change in ownership between McGarry and Brother:

> [McGarry] and [Brother] once were equal 50 percent owners of Iron Mountain . . . . [McGarry] sold one half of his 50 percent share, or 25 percent of the total shares of that company, to [Brother] for $150,000 in January of 2016. The Court finds that this was an arms-length transaction that was not entered into in an effort to transfer income or to conceal financial resources. Indeed, it was made because [McGarry] reportedly needed that money in order to facilitate a property settlement with his earlier divorce.

*Ranching Losses and Additional Depreciation*

¶19   Brother testified that Iron Mountain's main business is construction, specifically installing rebar and post tension. In 2018 or 2019, based on an "idea" proposed by his accountant, Brother

purchased the Ranch. Brother stated that the "purpose" of acquiring the Ranch was to "diversify" and "build capital" by "converting cash to something that will actually appreciate." He explained that the purchase was also driven by his desire to work in an area he was "more familiar with," noting that he had previously worked on a ranch but was "not a rebar genius by any means." Brother affirmed that as Iron Mountain's majority shareholder, it was solely his decision to purchase the Ranch and that he did not consult McGarry about the decision.

¶20    McGarry's testimony about the purchase of the Ranch was in line with Brother's. He stated that while the Ranch was "[n]ot necessarily" related to Iron Mountain's rebar business, its purpose was to provide Iron Mountain with "another source of income" during the years when things were not "as good in construction."

¶21    As to the current state of the Ranch, Brother acknowledged that the property had yet to produce any income but had incurred significant development expenses. He testified that at the time the Ranch was purchased it "wasn't producing" crops or livestock because it was "undeveloped" but that since the purchase, Iron Mountain had been actively working to develop the land. Brother expressed a willingness to sell the Ranch, rather than to operate it, if he could not make it profitable.

¶22    Brother and McGarry both testified that at the time of trial, the only person living on the Ranch was their father. Their father lived in his travel trailer and did not pay rent; however, he was responsible for taking care of the livestock on the land. Brother stated that he personally did not stay at the Ranch but that McGarry occasionally spent weekends there with his children and Wife. McGarry made a similar statement during his own testimony.

¶23    Lastly, McGarry and Brother were questioned at length by Ward's counsel regarding several assets that had depreciated

through Iron Mountain, including vehicles, trailers, side-by-sides, and a four-wheeler. Brother testified that the "majority" of these assets could be used both on and off the Ranch, that some of them had actually been used off the Ranch, that Iron Mountain's employees routinely drove the vehicles, and that the depreciation schedule for all of Iron Mountain's assets was prepared by Brother's accountant. McGarry testified that he was not responsible for purchasing any of the items and that he did not use them for recreation. McGarry also stated that he did not prepare the taxes for Iron Mountain and was not responsible for its depreciation schedule.

¶24 The district court declined to include in Iron Mountain's income any losses or depreciation stemming from the Ranch and made the following findings in support of its decision:

> The Court finds that as a majority holder of Iron Mountain, [Brother] is at liberty to unilaterally make financial decisions on behalf of the company . . . .
>
> . . . The Court finds that [McGarry] does not control investments, distribution of income, or any substantial aspect of the financial operation of [Iron Mountain]. . . . The Court finds that the purchase of the [Ranch] that was directed by [Brother] on behalf of Iron Mountain was a legitimate business decision.
>
> . . . The Court notes that [Ward] made much of the fact that [the Ranch], although it's been in the possession of Iron Mountain for at least a few years, has not generated any income and has taken a considerable amount of expenses. . . . The Court finds that the fact that the property has not generated income in no way diminishes the notion

that it was purchased for legitimate investment concerns by Iron Mountain. And in any event, the Court finds that [McGarry] did not have any hand in that purchase, nor would he have the ability to either facilitate that purchase or to resist the purchase, because he was a minority shareholder in Iron Mountain.

*Sanctions*

¶25   In a separate order, the district court denied Ward's request to sanction McGarry pursuant to rules 11 and 37 of the Utah Rules of Civil Procedure for what Ward believed was McGarry's "significant and repeated delay of . . . refusing to provide a full income disclosure." The court reasoned as follows:

Although it appears that [McGarry] was dilatory in providing some required records, the court cannot find that the delay was an intentional effort to undermine [Ward's] ability to prepare for trial, nor does the court find that [Ward] was materially harmed by the untimely disclosures. Therefore, the court declines to exercise its discretionary authority to order sanctions against [McGarry].

ISSUES AND STANDARDS OF REVIEW

¶26   Ward now appeals, raising two issues for our review. First, Ward challenges the district court's determination of McGarry's income. "In reviewing child support proceedings, we accord substantial deference to the district court's findings and give it considerable latitude in fashioning the appropriate relief. We will not disturb that court's actions unless the evidence clearly preponderates to the contrary or there has been an abuse of discretion." *Corn v. Groce*, 2024 UT App 84, ¶ 20, 552 P.3d 245

(quotation simplified). However, the district court's interpretation of a controlling statute "is a question of law that we review for correctness." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, ¶ 11, 245 P.3d 184 (quotation simplified).

¶27 Second, Ward argues the district court erred in denying her request for sanctions. "The standard of review for evaluating the denial or imposition of rule 11 sanctions involves a three-tiered approach: (1) findings of fact are reviewed under the clearly erroneous standard; (2) legal conclusions are reviewed under the correction of error standard; and (3) the type and amount of sanctions to be imposed are reviewed under an abuse of discretion standard." *Hess v. Johnston*, 2007 UT App 213, ¶ 6, 163 P.3d 747 (quotation simplified), *cert. denied*, 186 P.3d 957 (Utah 2008). As to rule 37 sanctions, a district court is given "a great deal of latitude in determining the most fair and efficient manner to conduct court business." *Hull v. Wilcock*, 2012 UT App 223, ¶ 36, 285 P.3d 815 (quotation simplified), *cert. denied*, 293 P.3d 376 (Utah 2012). However, before the court may apply rule 37 sanctions, it must make "a factual finding that the party's behavior merits sanctions," and "we will uphold any such finding unless it is clearly erroneous." *Erickson v. Erickson*, 2018 UT App 184, ¶ 11, 437 P.3d 370 (quotation simplified). "A factual finding is deemed clearly erroneous only if it is against the clear weight of the evidence when viewed in light of the entire record." *Golden Meadows Props., LC v. Strand*, 2011 UT App 76, ¶ 5, 249 P.3d 596 (quotation simplified), *cert. denied*, 263 P.3d 390 (Utah 2011).

ANALYSIS

I. Calculation of Income

¶28 Ward's primary contention on appeal is that the district court incorrectly calculated McGarry's income for purposes of child support. During her closing argument at trial, Ward argued

that the court should determine McGarry's gross income pursuant to Utah Code section 78B-12-203.[3] Because subsection (4)(a) of that section allowed the court to deduct from gross receipts only those expenses that were necessary for business operation, she proposed a "straightforward formula and calculation" for the court to follow when determining McGarry's income. That is, Ward asked the court to start with the income listed on McGarry's 2020 tax return and then "add back" to his listed income three things that had been deducted that were not necessary for business operation. The court ultimately declined Ward's request and instead calculated McGarry's income according to his tax documents, but then imputed a higher income figure to McGarry based on McGarry's own stipulation.

¶29 Ward argues the district court's decision to calculate McGarry's income in this manner was improper for two reasons. First, she contends the court was not allowed to impute McGarry's income but was instead required to calculate it pursuant to Utah Code section 78B-12-203(4). Second, she contends that despite the court's asserted failure to apply the requisite statute, the court abused its discretion by making factual findings to justify the award that are not supported by the evidence. We begin by addressing the statutory provisions controlling the determination of a parent's gross income. After determining that the court did not err in applying the statute, we then turn to Ward's specific challenges to the court's factual findings.

---

3. This statute has recently been amended and renumbered as Utah Code section 81-6-203. Although the substance of the amended statute remains largely unchanged, some of the language is different. *Compare* Utah Code § 78B-12-203 (2022), *with id.* § 81-6-203 (2024). In this opinion, we cite the version of the statute in effect at the time the district court rendered its decision without noting the year.

A.      Imputation of Income

¶30    Ward first asserts the district court committed legal error by failing to properly apply the requisite statute to calculate McGarry's income. Specifically, she argues the court ignored Utah Code section 78B-12-203(4), which directs how to determine the gross income of an individual who is self-employed, but instead imputed McGarry's income based on his "unilateral stipulation." Ward misreads the statute and mischaracterizes the court's actions.

¶31    The Utah Child Support Act outlines the process by which a district court must evaluate the income of a parent when calculating child support. To begin, the court must determine the "gross income" of a parent. *See* Utah Code § 78B-12-203(1). Gross income may be calculated in a number of different ways. "Gross income from self-employment or operation of a business shall be calculated by subtracting necessary expenses required for self-employment or business operation from gross receipts." *Id.* § 78B-12-203(4)(a). However, gross income may also include income imputed to a parent, provided that certain requirements are met. *Id.* § 78B-12-203(7)–(8). In "contested cases," income may be imputed only if "a hearing is held and the judge . . . enters findings of fact as to the evidentiary basis for the imputation." *Id.* § 78B-12-203(8)(a).

¶32    Here, the district court ultimately elected to impute McGarry's income after calculating his self-employment income. The court's underlying decision to determine McGarry's income in this manner was not error. Pursuant to the statute, the court was permitted to determine McGarry's gross income in a number of different ways, including through imputation. Because this is a contested case, the court could properly impute McGarry's income only if it conducted a hearing and supported the imputation with findings of fact detailing the evidentiary basis for the imputation. *See id.* And that is precisely what happened here.

The court held a hearing, made factual findings based on the evidence presented at the hearing, and imputed income to McGarry based on those findings.

¶33 As explained above, the district court began by looking at the income listed on McGarry's tax return. Based on that document, the court determined that McGarry's monthly income was $18,284, and it entered factual findings in support of this determination.[4] However, the court then chose to depart from this amount, electing to instead impute McGarry's income at $32,318 per month, an amount that the court found was "well in excess of" that which was supported by his tax return. The court made specific factual findings to support this departure. The court found that McGarry had expressed a "willingness" to have his income imputed at the higher amount, and it recognized that the

---

4. Ward acknowledges the district court "entered findings of fact as to the evidentiary basis for an award of $18,000 per month." However, she asserts the court's finding of $18,284 was incorrect because (1) the court had previously determined that McGarry's income was "at least" $20,833 per month and (2) evidence showed that McGarry had purchased several items on his Iron Mountain company credit card that he had not proven were reimbursed to Iron Mountain. Neither challenge is availing. As to the first, Ward fails to mention that the $20,833 sum was entered by default and therefore does not create a meaningful datapoint or otherwise demonstrate error now. And as to the second, Ward wholly ignores the court's multiple findings specifically related to McGarry's business credit card purchases. The court found that "the use of credit cards, although it could be evidence of income, does not equate income," and that "the credit card purchases that [Ward] is relying on in order to establish income were amounts that were put on the credit card, but were immediately reimbursed by other individuals." Without challenging these findings directly, Ward cannot prove error.

higher amount was not random but was instead rooted firmly within the evidence presented at trial. That is, the higher amount represented the inclusion of Wife's distribution from McGarry Land. Therefore, the court's imputation was amply supported by "findings of fact as to the evidentiary basis for the imputation." *Id.*

¶34 Nevertheless, Ward asserts it was inappropriate for the district court to take this approach because the court chose to impute McGarry's income at the amount he proposed. She argues that allowing a court to impute income at whatever level the party being imputed requests conflicts with Utah's policy that children have the right to be supported by their parents. *See Hills v. Hills*, 638 P.2d 516, 517 (Utah 1981) (stating that children's right to support from their parents "is not subject to being bartered away, extinguished, estopped or in any way defeated by the agreement or conduct of the parents"). She further notes that the issue of unilateral stipulation was already addressed by this court in the prior appeal of this case, where we determined that the district court's imputation was infirm because the court had merely adopted McGarry's proposed imputation without conducting an evidentiary hearing or supporting the imputation with factual findings. *See Ward v. McGarry*, 2021 UT App 51, ¶¶ 9–10, 491 P.3d 970. But the challenges Ward raises are not well taken at this juncture. Critically, the district court's current imputation was determined following a hearing on remand and is supported by factual findings. Moreover, the policy concern raised by Ward is not implicated because the amount of income the court imputed to McGarry was *higher* than the income it calculated based on McGarry's tax return.

B.    Factual Findings Supporting the Award

¶35 Ward next asserts that in addition to failing to apply Utah Code section 78B-6-203(4)(a), the district court also abused its discretion in awarding child support because the amount of

income it chose to impute to McGarry is inconsistent with the evidence in the record. To that end, Ward challenges the court's factual findings concerning each of the three things she unsuccessfully argued the court should "add back" into McGarry's income. Those things are (1) Wife's salary from Iron Mountain, (2) amounts resulting from McGarry having a greater effective ownership interest in Iron Mountain, and (3) ranching losses and additional depreciation. We address each of Ward's challenges in turn.

1.      Wife's Salary from Iron Mountain

¶36     At trial, Ward requested that the district court include in McGarry's income the salary earned by Wife from Iron Mountain. The court declined Ward's request, finding that Wife "is substantially and separately employed by Iron Mountain." Ward contends that this finding is contrary to the evidence for three reasons: (1) Wife is "employed full time" at another job; (2) the work Wife does is "actually for McGarry Land," not Iron Mountain; and (3) a person in McGarry's position should be making significantly more than what he makes in salary from Iron Mountain. None of the arguments raised by Ward demonstrate that the court's finding should be disturbed.

¶37     First, Ward has not articulated why Wife's employment with an entity other than Iron Mountain would have any particular bearing on her ability to also be employed by Iron Mountain. Indeed, the court did not find that Wife is *solely* employed by Iron Mountain, just that she is *separately* employed by the company, a point which was clearly illustrated during trial. Of note, McGarry testified that though Wife is a full-time employee of a local school district, she is also "an officer of [Iron Mountain], and she helps [him] with [his] office work." Likewise, Brother testified that Wife is an employee of the company. Ward has not pointed to any evidence contradicting this testimony.

¶38 Second, Ward has not carried her burden to show that the district court clearly erred in finding that Wife is employed by Iron Mountain rather than McGarry Land. The court was presented with ample evidence that Wife is an employee of Iron Mountain. This evidence included testimony from McGarry and Brother indicating that Wife works for Iron Mountain, as well as Wife's W-2 from Iron Mountain showing that she receives her salary from the company in her own right. On appeal, Ward has not put forth any conflicting evidence. Rather, her argument is merely that the testimony offered by McGarry explaining what Wife's responsibilities at Iron Mountain entail was "vague." This is not enough to "overcome the healthy dose of deference owed to factual findings." *Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890 (quotation simplified).[5]

¶39 Third, Ward's contention that McGarry's salary should be higher is not persuasive. Ward asserts that a person in McGarry's position should be "making significantly more than the [amount] he claims to be his salary" and that attributing both McGarry's and Wife's salaries to McGarry would be "much more reasonable considering the evidence." But other than this bare assertion, Ward did not present any evidence of what McGarry should be

---

5. In any event, even assuming the district court was incorrect in finding that Wife is employed by Iron Mountain rather than by McGarry Land, such error was harmless and is therefore not a ground for reversal. *See Huish v. Munro*, 2008 UT App 283, ¶ 8, 191 P.3d 1242 ("Unless an appellant demonstrates that an error is prejudicial, it will be deemed harmless and no appellate relief is available." (quotation simplified)). Regardless of which entity employed her, there is sufficient evidence to support the court's finding that Wife's income is attributable only to her.

making.[6] In contrast, McGarry put forth evidence demonstrating that from 2014 to 2020 his salary from Iron Mountain has been $1,000 per week, which evidence Ward has failed to engage with on appeal. Therefore, because the court's finding is "supported by the evidence" and Ward has not identified "flaws in the evidence relied on by the district court that rendered the court's findings clearly erroneous, we will not reverse." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 31, 540 P.3d 727 (quotation simplified).

¶40     For all these reasons, Ward's challenge to the district court's factual finding that Wife "is substantially and separately employed by Iron Mountain" fails.

2.      McGarry's Effective Ownership Interest in Iron Mountain

¶41     Ward challenges the district court's factual findings regarding the percentage of McGarry's effective ownership interest in Iron Mountain. But Ward has again failed to meet her burden of persuasion on this issue because she merely points to potentially conflicting evidence that would support her position while ignoring evidence that supports the challenged findings.

¶42     The district court found that in January 2016, McGarry sold "25 percent of the total shares" of Iron Mountain to Brother in "an arms-length transaction that was not entered into in an effort to transfer income or to conceal financial resources" but was instead "made because [McGarry] reportedly needed that money in order to facilitate a property settlement with his earlier divorce." The

6. Ward points to Brother's statement at trial that he "distribute[s] to [McGarry] a minimum of $15,000 each month" as evidence of what a person in McGarry's position earns. But Brother specified that this monthly payment is a *distribution* payment, not a payment toward McGarry's salary; so Ward's reliance on Brother's statement as establishing a reasonable salary is misplaced.

court further found that McGarry owns 50% of McGarry Land, which owns the remaining 25% of Iron Mountain, thus giving McGarry an effective 12.5% ownership interest in Iron Mountain.

¶43    Ward asserts these findings are not adequately supported because the evidence upon which the district court relied was "contradictory on multiple counts." According to Ward, the "disputed evidence" presented at trial "weighs more in favor of [McGarry] still holding 50% ownership of Iron Mountain, as the alleged transfer of 25% interest to [Brother] was in 2016—well into the litigation of this case and well past the time of [McGarry's] divorce." She then articulates two reasons that she believes the evidence is in apparent contention with the court's findings. First, she asserts that McGarry provided inconsistent testimony regarding the transfer of Iron Mountain shares to his ex-wife, more specifically, that McGarry initially testified he gave his ex-wife a share of Iron Mountain as part of their divorce settlement in 2012 but that he later explained that he actually made equalization payments to her each month until she was paid the full equalization amount. Second, Ward points to Iron Mountain's corporate documents, which show that McGarry's change of ownership from 50% to 25% occurred in 2016, which was four years after his divorce.

¶44    "The existence of conflicting evidence in the record is not sufficient to set aside a district court's findings." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 27, 540 P.3d 727. "The pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a fatal flaw—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." *Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733 (quotation simplified). "The district court's mission is to consider and weigh all the conflicting evidence and find the facts." *Lobendahn*, 2023 UT App 137, ¶ 27 (quotation simplified). "Credibility determinations are within the province of the trial

judge, who is uniquely equipped to make factual findings based exclusively on oral testimony due to his or her opportunity to view the witnesses firsthand, to assess their demeanor and to consider their testimonies in the context of the proceedings as a whole." *Kidd v. Kidd*, 2014 UT App 26, ¶ 34, 321 P.3d 200 (quotation simplified).

¶45 McGarry was questioned repeatedly at trial regarding the transfer of his ownership interest in Iron Mountain. He explained that after Brother became involved with Iron Mountain, McGarry owned 50% of the company with his ex-wife, with each owning an equal 25% share. Then, in December 2012, McGarry and his ex-wife divorced. He explained that as part of the divorce settlement, the value of the business was divided equally between the divorcing spouses. At that point, McGarry was granted the entire 50% ownership interest in Iron Mountain and was ordered to pay his ex-wife a $150,000 equalization payment.

¶46 McGarry further testified that in 2013, after his divorce had been finalized, he and Brother "discussed" an option under which Brother would buy half of McGarry's Iron Mountain shares so that McGarry could satisfy his equalization debt. That option was to remain "through [2015], when the equalization was final." In January 2016, Brother exercised the option and purchased half of McGarry's shares, leaving McGarry with 25% of Iron Mountain shares. McGarry explained that his Iron Mountain share was thereafter transferred to his holding company, McGarry Land, which is owned equally by him and Wife, meaning that he and Wife effectively each own 12.5% of Iron Mountain.

¶47 Based on this testimony, the district court's findings that McGarry Land owns 25% of Iron Mountain and that McGarry owns 50% of McGarry Land are not clearly erroneous. McGarry's testimony provided the court with detailed information regarding the ownership history of Iron Mountain. Although Ward implies that McGarry was being less than truthful with his account of

events, the fact remains that the court was confronted with the witness before it and was entitled to assess his credibility. And when considered in the context of the proceedings as a whole, the inconsistencies Ward alleges do not in fact amount to inconsistencies. McGarry continuously maintained that he was ordered to divide the monetary value of Iron Mountain with his ex-wife. That he originally indicated she was awarded her share in the company but later explained the division was accomplished through an equalization payment is not inconsistent; in both scenarios, she received half of the value of the couple's interest in Iron Mountain.

¶48　Moreover, Ward has not specifically challenged the portion of the district court's finding where the court determined that McGarry, as 50% owner of McGarry Land, is entitled to half of McGarry Land's Iron Mountain distribution (representing a 12.5% ownership interest in Iron Mountain). Although Ward's argument below focused on the division of McGarry Land's distribution between McGarry and Wife—with Ward taking the position that the court should attribute to McGarry the entire distribution rather than splitting it equally with Wife—on appeal, Ward has seemingly abandoned this specific argument, choosing instead to focus on the division of Iron Mountain's ownership between McGarry and Brother. In any event, even if Ward had challenged this aspect of the court's finding, it is unclear what relief she would be entitled to given that the court ultimately included Wife's distribution in McGarry's income per his stipulation.

¶49　Finally, nothing in either McGarry's testimony or the other documents introduced at trial showing that McGarry's change of Iron Mountain ownership from 50% to 25% occurred in 2016 are inconsistent with the district court's finding that the transfer occurred in 2016. Indeed, the evidence on this point is all consistent and is entirely in line with the court's finding.

¶50 The district court's findings regarding McGarry's ownership interest in Iron Mountain are not clearly erroneous. Ward has not identified a "fatal flaw" with the evidence relied on by the court, *Kimball*, 2009 UT App 233, ¶ 20 n.5 (quotation simplified), and the existence of potentially conflicting evidence is not enough to sustain her appellate burden.

3.    Ranching Losses and Additional Depreciation

¶51 Lastly, Ward assails the district court's factual findings regarding Iron Mountain's income. In particular, she takes issue with the court's determinations concerning the Ranch and the depreciation of assets.

¶52 At trial, Ward asked the district court to add back to Iron Mountain's income deductions for ranching losses and additional depreciation. She argued that while Iron Mountain was allowed to deduct the Ranch's operating losses from its income for tax purposes, the court could not deduct these losses when calculating Iron Mountain's income for child support purposes. Citing Utah Code section 78B-12-203(4)(a), she asserted that the court was permitted to deduct only "necessary expenses" from gross receipts, which she argued did not include the claimed ranching losses. She also argued that Iron Mountain should not be allowed to deduct the depreciation of certain equipment, including vehicles and other machinery, because the equipment was not necessary to operate Iron Mountain's rebar business and was instead purchased to be used on the Ranch for personal use and recreation.

¶53 The district court declined to exclude any ranching losses or claimed depreciation from Iron Mountain's income. The court found that Iron Mountain had purchased the Ranch as an "investment" and that the purchase was "a legitimate business decision." Furthermore, the court found that McGarry does not control the investments or financial operation of Iron Mountain;

that the purchase of the Ranch was at the behest of Brother; and that McGarry, as a minority shareholder in Iron Mountain, had no way "to either facilitate or resist the purchase."

¶54 Ward argues these findings are not detailed and are contrary to the evidence. She first complains the district court did not explain how the Ranch is a "necessary" business expense and instead made an "irrelevant" finding that the purchase of the Ranch was for "legitimate investment concerns by Iron Mountain." As was the case below, the crux of this argument is that the court was required to evaluate whether the Ranch was a "necessary" business expense under Utah Code section 78B-12-203(4)(a). And Ward contends that, pursuant to that section, the court could deduct the Ranch's operating losses from its gross receipts only if it determined that the Ranch was necessary for Iron Mountain to operate. But, as we have already explained, the court was not required to calculate McGarry's income solely by reference to section 78B-12-203(4)(a). *See supra* Section I.A.

¶55 Given the evidence presented at trial, we conclude the district court's factual findings about the Ranch are not clearly erroneous. Regarding the purchase of the Ranch, McGarry and Brother both testified that the purpose of Iron Mountain purchasing the Ranch was to build capital and to diversify the company's portfolio. This testimony wholly supports the court's finding that the purchase was "a legitimate business decision." And given that Ward devotes all her energy to showing that the purchase of the Ranch was not necessary, she makes no attempt to address the court's actual finding.

¶56 Ward also complains the district court's finding that Brother was responsible for purchasing the Ranch is contrary to the evidence because the testimony at trial was that McGarry and Brother jointly pursued the purchase. But Ward has not attempted to marshal the evidence supporting the court's finding. Importantly, the court credited both McGarry's and Brother's

testimony that Brother is the majority shareholder of Iron Mountain and has the authority to make all financial decisions for the company. And Brother stated that in exercising that authority he unilaterally decided to purchase the Ranch without consulting McGarry. Further, Brother testified he is solely in charge of the depreciation schedule for all equipment, ranching or otherwise, and he averred that he leaves it to his accountant to prepare such schedules. All this testimony provides solid evidentiary support for the court's findings about the financial control of Iron Mountain and McGarry's inability to make any financial decisions for the company on his own accord.

¶57    Because the court articulated well supported reasons not to "add back" into Iron Mountain's income any ranching losses or other depreciation and Ward has not identified problems with the evidence upon which the court relied, she has failed to carry her burden to show that the court's findings are clearly erroneous.

## II. Sanctions

¶58    Ward next argues the district court abused its discretion by declining her request to sanction McGarry. Her attack centers on the court's underlying factual finding, which she asserts is clearly erroneous. Ward's challenge fails, however, because she has not marshaled the evidence supporting the court's finding and has therefore not carried her appellate burden of persuasion.

¶59    Prior to trial, Ward moved for sanctions pursuant to rules 11 and 37 of the Utah Rules of Civil Procedure "due to the significant and repeated delay of [McGarry] refusing to provide a full income disclosure." The court declined Ward's request, finding that although McGarry was "dilatory in providing some required records," the delay was not "an intentional effort to undermine [Ward's] ability to prepare for trial."

¶60 On appeal, Ward contends the district court's characterization of McGarry being "dilatory" is "an understatement" and that the court's subsequent determination that McGarry's delay was not an intentional effort to undermine Ward's trial preparation "is 'against the clear weight of the evidence' when viewed in light of the entire record." (Quoting *Pennington v. Allstate Ins. Co.*, 973 P.2d 932, 937 (Utah 1998).) But Ward supports her position by merely accusing McGarry of providing incomplete financial disclosures, and she again does not grapple with the evidence supporting the court's finding.

¶61 Critically, Ward was unable to point the district court to any statement of discovery issues she filed specifically targeting any alleged inadequacies related to McGarry's financial disclosures or rule 26.1 disclosures, nor could she identify a record cite for one when asked to do so during oral argument before this court.[7] Moreover, Ward does not acknowledge any of the documentation McGarry did turn over during the litigation. McGarry identified in his trial brief a long list of instances where he filed financial declarations; updated financial declarations; provided personal tax returns; and provided business financials, including tax returns, credit card statements, and bank statements. Because Ward has not marshaled any of this evidence, let alone even attempted to do so, she has not carried her burden of demonstrating that the court's finding is clearly erroneous. As a result, we cannot say that the court abused its discretion when it declined Ward's request for sanctions.

---

7. Ward filed one statement of discovery issues prior to trial. That statement did not have to do with the adequacy of McGarry's financial disclosures. Instead, Ward sought "documents related to all income, personal and business," for the years 2010 through 2018.

CONCLUSION

¶62　The district court did not abuse its discretion in determining McGarry's income. The court properly applied Utah law, and the factual findings supporting its income imputation are not clearly erroneous. Likewise, the court did not abuse its discretion when it declined Ward's request for sanctions because the factual finding underlying that decision is not clearly erroneous.

¶63　Affirmed.[8]

_____

---

8. Ward requests an award of appellate attorney fees under rules 11 and 26.1 of the Utah Rules of Civil Procedure and under rule 33 of the Utah Rules of Appellate Procedure. Ward's request under each of these rules is misplaced. As an initial matter, this court does not award attorney fees under the Utah Rules of Civil Procedure; those fees are left to the discretion of the *district* court. *See* Utah R. Civ. P. 11(c), 26.1(f). And fees are awarded under rule 33 when "a motion made or appeal taken under [the appellate rules of procedure] is either frivolous or for delay." Utah R. App. P. 33(a). But Ward was the appealing party in this case, and her suggestion that McGarry attempted to delay the appeal by requesting two extensions of time to file his brief falls flat given that she stipulated to the first request and she herself requested additional time to file her reply brief. For these reasons, we decline Ward's request for fees.