**2024 UT App 168**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAYMIAN MARTIEZ HUGHES,
Appellant.

Opinion
No. 20220640-CA
Filed November 15, 2024

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 191906101

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

LUTHY, Judge:

¶1 Daymian Martiez Hughes appeals his convictions of criminal trespass, sexual battery, unlawful detention, and four counts of domestic violence in the presence of a child. He contends that the evidence at trial was insufficient to support the convictions and that his trial counsel (Counsel) rendered constitutionally ineffective assistance by introducing evidence that Hughes and one of his victims were subject to a mutual restraining order at the time of the crimes. We determine that the evidence was sufficient to support the convictions and that any error by Counsel in introducing evidence of the mutual restraining order did not prejudice Hughes's defense. We therefore affirm Hughes's convictions.

BACKGROUND[1]

*The Backstory*

¶2     Hughes and his former live-in girlfriend (Mother) have four children together, a son (Son), who was thirteen years old at the time of the incident giving rise to this case, and three daughters (Oldest Daughter, Middle Daughter, and Youngest Daughter), who were eleven, ten, and nine years old at that time. Mother left Hughes in 2018, and she and the children moved into the basement of her mother and stepfather's home (Grandparents' home).

¶3     Following their separation, Mother and Hughes regularly exchanged time with the children based on the terms of a custody agreement. Mother and Hughes were also subject to a mutual restraining order that directed them not to have physical contact with each other, to communicate only via text messages and only about the children, and to conduct their exchanges of the children curbside.

*The Incident*

¶4     In May 2019, Grandparents' home flooded, so Mother and the children stayed at a hotel for a few days while the home was being cleaned. On one of those days, Mother and the daughters were "hanging out" at the hotel pool while Son went with Hughes to a basketball practice. After the practice, Son called Mother to ask if he could stay with Hughes. Mother told Son that he needed to return to the hotel. Hughes then got on the phone and asked Mother if he "could come over and hang out and spend [some]

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565 (cleaned up).

time." Mother told him "no," explained that she and the daughters were "going to go back to the hotel room," and asked that Hughes "just drop [Son] off." Mother and the daughters then returned to their room "to change and get ready for bed."

¶5     The hotel room had a small kitchenette, a bathroom with a tub, and an area with beds. A curtain could be pulled to separate the bed area from the rest of the room. Mother was at the bathtub helping Youngest Daughter, who has a disability affecting her speech and "some . . . things that she does physically," when there was a knock at the hotel room door. Mother left Youngest Daughter and went to the door. When she opened it, both Son and Hughes walked in. Mother told Hughes that he "wasn't supposed to be there" and "that he had to go." He responded by asking "if [she] wanted to do something, if [she] wanted to go out, if [the two of them] could talk, [and] if he could stay." Mother said, "No," telling Hughes, "[Y]ou're not supposed to be here, you know that. I don't want you here. Just leave."

¶6     Mother asked Middle Daughter to get Youngest Daughter out of the tub, which she did, and all the children went to the bed area of the room. Hughes partly closed the curtain separating the beds from the rest of the room and then "kept insisting to kiss [Mother]." She refused. Eventually, Hughes "grabbed and pushed [Mother] against the wall," placed "his hands on the wall," and put "his whole body against [her]." Mother—still wearing only a swimming suit and "swimming cover"—"kept telling him to leave and get out," but Hughes insisted that they "needed to get back together." He then began "grabbing [Mother's] butt," "touching [her] breast," and "touching everything." Mother began to cry and asked Hughes "several times to stop and to leave and to get out."

¶7     Hughes told Mother that "it didn't matter" whether she "wanted to be with him, that nobody could have [her] but him," and "that the only way for him to leave" would be for Mother to

"call[] the cops." He then "kind of backed up a little bit" and told Mother "how it was the best thing to do to be together" and that they "couldn't be apart anymore." Mother testified that Hughes also said that if the police came, he would "bang it out"; that Hughes "pulled his shirt up"; and that when he did, she saw "the handle of a gun in his pants." Hughes then pushed Mother against the wall again, and she continued to beg him to leave and let her go.

¶8      At that point, Middle Daughter also asked Hughes to leave. Hughes "lunged for her," saying, "Shut up. You're my daughter. . . . [T]his has nothing to do with you. Don't talk to me like that. This is none of your business." As Hughes moved toward Middle Daughter, Mother opened the hotel room door, stepped into the hallway, and, while holding the door open and "trying to be loud so somebody could hear," said, "You have to leave." Hughes followed Mother into the hallway, and she closed the door.

¶9      In the hallway, Mother—more loudly now—kept "telling [Hughes] to leave," and Hughes "kept saying he wasn't leaving." Hearing "yelling down the hall," including from an "angry," "raised" male voice, the hotel's front desk manager (Manager) came and intervened, saying to Hughes, among other things, "I'll tell you she doesn't want you here. You need to just leave now." After some discussion, Hughes said that he would leave, and Manager returned to her desk.

¶10     Shortly thereafter, Manager heard Hughes say angrily, "Let's just get in the room." Manager then walked back down the hall and said to Hughes, "All right. I can't have this. And I asked you to leave." When Hughes replied, "No, we're going to go in the room," Manager asked Mother, "Do you want him in your room?" Mother stepped back and said, "No," and Hughes "reached for her." Manager "threw [her] arm across the door jam," "told [Hughes] this wasn't happening in [her] hotel," and

threatened to call the police. Hughes said, "Go ahead," so Manager asked an associate, who had remained at the front desk, to call the police to have Hughes "escorted off of the property." Hughes then told Manager that he would "rent a room," but Manager told him she would not rent a room to him and that he had to leave. Hughes, Mother, and Manager then "stood there silently for a few minutes" until Hughes finally left.

*Mother's Statement to Police and the Resulting Charges*

¶11　Shaken, Mother went back inside the hotel room to "calm [the] kids down," "make sure that they were okay," and "get them ready for bed." Later that night, Mother's mother and stepfather came to the hotel room, learned of the incident, and encouraged Mother to report the incident to the police, which she did.

¶12　Initially, Mother spoke on the phone to a police dispatch operator. Mother began by telling the operator that she and Hughes had "a standing order, mutual restraining order." She then explained what had occurred earlier in the evening. Toward the end of the call, Mother volunteered that Hughes might "have a gun," that she believed this "[b]ecause he told [her] he did," but that she "[d]id [not] ever see the gun."

¶13　An officer (Officer) was dispatched to the hotel, where he interviewed Mother. Mother recounted to Officer the incident with Hughes. Mother told Officer, as she had the dispatch operator, that while she believed, because of what Hughes had said, that he had been carrying a gun, she had not actually seen a gun.

¶14　Following Officer's initial investigation on the night of the incident, a detective (Detective) was assigned to conduct an additional investigation. As part of his additional investigation, Detective also interviewed Mother. In that interview, Mother told Detective that during the incident, Hughes had "pulled up his shirt and exposed the handle [of a gun] in his waistband." Mother

told Detective that Hughes "did not touch [the gun]" and that "she was not in fear for her own personal safety" because "she didn't feel that the gun was there for her." Yet Mother said that she was concerned about the gun because when she had threatened to call the police, Hughes had said he was prepared to "bang it out."

¶15 Following Officer's and Detective's investigations, Hughes was charged with criminal trespass, sexual battery, unlawful detention, threatening with or using a dangerous weapon in a fight or quarrel, and four counts of domestic violence in the presence of a child. The case proceeded to trial.

*The State's Case at Trial*

¶16 At trial, Mother, Oldest Daughter, Middle Daughter, Manager, and Detective testified for the State. At the beginning of the trial, the prosecutor and Counsel discussed with the court whether evidence of the mutual restraining order between Mother and Hughes was admissible. Before the court ruled on that issue, however, the prosecutor proposed that

> instead of mentioning the mutual restraining order or admitting a certified copy of [it], . . . [the parties] instead allow [Mother] to state . . . that she had communicated with [Hughes] previously, that she did not want him to be around her and that she did not want to communicate with him in any fashion but text and to do drop offs instead of physically coming into her home or where she was at.

Counsel said that he had "no problem with [Mother] saying that." Thus, the court ruled that "the parties [could] talk about the understanding [Mother and Hughes] had between each other . . . [and] facts that would give rise to that understanding" but that the parties and the court would need to "have a chat" before anyone "raise[d] the issue of a mutual restraining order."

¶17 Mother's and Manager's testimony about the incident at the hotel was consistent with the description of that incident outlined above. In accordance with the court's ruling, Mother did not mention the mutual restraining order but, instead, testified that she and Hughes had a "mutual understanding" that there was to be "no direct contact between" them and "no communication, unless it was in regards to the children via text." She also testified that she had "made clear to [Hughes] that [she] didn't want him . . . to be around [her] physically."

¶18 Oldest Daughter testified that after Mother and the daughters returned from the pool, Hughes came to the hotel room, knocked on the door, and came into the room without asking for Mother's permission. She explained that after Hughes came into the room, he tried "to convince [Mother] to come back to the house" but that Mother "didn't want to go back." Oldest Daughter stated that Mother had asked Hughes to leave "multiple times" but that he did not leave. Oldest Daughter recounted that she sat on one of the beds and cried as she listened to her parents' exchange. She testified that although the curtain had been partially pulled, she could see Mother and Hughes and that she witnessed Hughes trying to "grab," "touch," and "kiss" Mother and Mother "crying the whole time" and asking him to stop and to leave.

¶19 Middle Daughter confirmed that Hughes came to the hotel room after Mother and the daughters returned from swimming. She said that "there was a little bit of conflict" between Hughes and Mother and that Mother "asked him to leave." Middle Daughter explained that, rather than leave, Hughes "hugg[ed]" Mother and, eventually, held Mother "against the wall." Middle Daughter remembered Mother crying and continuing to ask Hughes to leave. Middle Daughter testified that she also asked Hughes to leave and that when she did, "he turned and faced" her and told her that she "shouldn't interfere and that it wasn't [her] place." During that exchange, Middle Daughter said, Mother

"went and opened the door." Middle Daughter testified that she then observed Mother and Hughes go into the hallway, where they continued to be "loud."

¶20    Prior to trial, Oldest Daughter and Middle Daughter had been interviewed at the Children's Justice Center (CJC). During their respective interviews, each had claimed to either not remember or not know of anything problematic about Hughes's visit to the hotel room. At trial, each acknowledged that her statement to the CJC interviewer contradicted her trial testimony. Oldest Daughter explained the discrepancy by saying that she had been "uncomfortable talking with" the CJC interviewer and that she now "just want[ed] it to be over" because she was "tired of going back and forth" between Mother and Hughes and wanted to "just . . . see [her] dad whenever [she] want[ed]." Middle Daughter explained that when she had been interviewed at the CJC, she "was still processing what [had] happened" and "wasn't ready to speak about what [had] happened."

*Hughes's Motion for a Directed Verdict*

¶21    After the State rested, Hughes moved for a directed verdict on two of the domestic violence in the presence of a child charges, arguing that the State had "not [made] any attempt" to prove that domestic violence had taken place in the presence of Son and Youngest Daughter. Hughes also moved for a directed verdict on the charge of threatening with or using a dangerous weapon in a fight or quarrel. The court denied the motions, and Hughes proceeded to put on his case.

*Hughes's Case at Trial*

¶22    Counsel called Son to testify. Son testified that when he and Hughes called Mother after the basketball practice, Mother told Hughes that he could join the family for swimming. Son explained that when he and Hughes arrived at the pool, they did not see Mother and the daughters and, thus, went to the hotel

room. Son stated that he knocked on the door and Mother answered, that Son then "walked in" and Hughes "asked if he could have a hug and a kiss and if he could come in and talk to [Mother] for a second," and that Mother said, "Yes," and kissed Hughes. Son testified that thereafter, it was Mother who "got loud" and that Hughes was "trying to calm her down." Son also testified that when Hughes and Mother went into the hallway, he could hear Mother "getting even louder."

¶23 Hughes also testified. He explained that although Mother had moved out, she would still occasionally "stay at [his] house" and that the two of them "would still do stuff," "were still intimate," and were "still friends and whatnot." He stated that Mother had "left [him] three or four times before" but "always came back" and that "that's what [they] do, makeup and breakup." Like Son, Hughes testified that on the day of the incident at the hotel, Mother told him he could bring Son and join her and the daughters for some "family time" at the pool. He testified that when he and Son ended up at the hotel room, Mother told him he could come in and that when he asked Mother for a kiss, "she walked up and kissed [him]." Hughes stated that after he suggested that it would be good for Youngest Daughter to spend more time with him, Mother started to "scream[] and yell[]" at him. According to Hughes, when Mother had lived with him, she "raised her voice a lot in front of . . . [the] children," and he would try to calm things down by taking Mother outside to talk. Similarly here, Hughes explained, he spent the rest of the encounter in the hotel "trying . . . to deescalate" the situation. He maintained that he never held Mother against a wall or groped her and that she never cried or told him to leave.

¶24 Counsel showed video recordings of Oldest Daughter's and Middle Daughter's CJC interviews. Counsel also played a recording of Mother's call to the police dispatcher, thereby showing that the call was not placed until "a couple hours" after the incident, that Mother's stepfather dialed the number and

spoke first with the dispatcher, that Mother told the dispatcher that she had not seen a gun on Hughes, and that Mother's description to the dispatcher of Hughes's conduct at the hotel was not as specific as her later description of that conduct when she testified at trial. The recording also contained Mother's statement that she and Hughes had "a standing order, mutual restraining order."

### *The Verdict, Motions to Arrest Judgment, and Appeal*

¶25    The jury found Hughes guilty of criminal trespass, sexual battery, unlawful detention, and all four counts of domestic violence in the presence of a child. It acquitted him of threatening with or using a dangerous weapon in a fight or quarrel. Following the verdict, Hughes moved to arrest judgment on each charge for which he had been found guilty. The court denied the motions and entered judgment against Hughes. Hughes now appeals.

### ISSUES AND STANDARDS OF REVIEW

¶26    Hughes first argues that the State presented insufficient evidence to support his convictions. As articulated, this argument has two parts. First, Hughes asserts that Mother's, Oldest Daughter's, and Middle Daughter's testimony was inherently improbable and should therefore be disregarded and that the remaining evidence is insufficient to support any of his convictions. Second, Hughes asserts that—with or without Mother's, Oldest Daughter's, and Middle Daughter's testimony— there is insufficient evidence to support his conviction of committing domestic violence in the presence of Son. "For a sufficiency of the evidence challenge, we will . . . reverse the fact finder's verdict [only] when the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v.*

*Barnes*, 2023 UT App 148, ¶ 16, 542 P.3d 108 (cleaned up), *cert. denied*, 544 P.3d 459 (Utah 2024).

¶27    Hughes also contends that he received constitutionally ineffective assistance of counsel when Counsel introduced the full recording of Mother's report to the police dispatcher without redacting Mother's reference therein to a mutual restraining order between Mother and Hughes. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Craft*, 2017 UT App 87, ¶ 15, 397 P.3d 889 (cleaned up).

ANALYSIS

I. Sufficiency of the Evidence[2]

¶28    Hughes's initial contention is that the State presented insufficient evidence to support any of his convictions because Mother's, Oldest Daughter's, and Middle Daughter's testimony was inherently improbable. When a sufficiency of the evidence challenge is based on the inherent improbability of certain evidence, our analysis proceeds in two parts. *See State v. Barnes*,

---

2. The State asserts that Hughes failed to preserve the sufficiency of the evidence claims he raises on appeal. Because the merits of these claims can be easily resolved in favor of the State, we choose not to address their preservation. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation."). Additionally, because we address the merits of Hughes's sufficiency of the evidence claims, we need not address Hughes's alternative argument that Counsel provided ineffective assistance by failing to preserve those claims.

2023 UT App 148, ¶ 19, 542 P.3d 108, *cert. denied*, 544 P.3d 459 (Utah 2024). We first "analyze the evidence that [the defendant] claims is inherently improbable and determine whether . . . [that] evidence is of such poor quality that it should be disregarded." *Id.* (cleaned up). "If we determine that the challenged [evidence] is inherently improbable, we then determine [whether] sufficient evidence remains under which a reasonable jury could have convicted." *Id.* (cleaned up). "On the other hand, if we determine that the challenged evidence is not inherently improbable, our sufficiency-of-the-evidence analysis will include the challenged evidence." *Id.* ¶ 20.

¶29 Here, except as to his conviction of domestic violence in the presence of Son, Hughes does not contend that the evidence is insufficient when the challenged evidence is included in the sufficiency-of-the-evidence analysis. Thus, because we determine that the evidence challenged here was *not* inherently improbable, we thereafter need only determine whether the charge of domestic violence in the presence of Son was supported by sufficient evidence when taking all of the evidence into account.

¶30 With that backdrop, we now address Hughes's inherent improbability argument. We then address whether there is sufficient evidence to support Hughes's conviction of domestic violence in the presence of Son.

A. Inherent Improbability

¶31 Hughes asserts that Mother's, Oldest Daughter's, and Middle Daughter's testimony was inherently improbable and must therefore be disregarded. Because the State's case against Hughes hinged on this testimony, he further asserts that when this evidence is disregarded, there remains insufficient evidence to support his convictions.

¶32 In *State v. Robbins*, 2009 UT 23, 210 P.3d 288, our supreme court held that "when [a] witness's testimony is inherently

improbable, the court may choose to disregard it." *Id.* ¶ 16. However, "Utah appellate courts have noted that labeling a witness's testimony as 'inherently improbable' should be reserved for rare cases. This is because appellate courts typically do not make credibility determinations, and typically resolve any arguments about conflicts in the evidence in favor of the jury verdict." *Barnes*, 2023 UT App 148, ¶ 23. Not surprisingly, therefore, "[i]t is difficult to successfully establish [an inherent improbability] claim on appeal." *State v. Cady*, 2018 UT App 8, ¶ 18, 414 P.3d 974, *cert. denied*, 421 P.3d 439 (Utah 2018).

¶33　When presented with an inherent improbability claim, we "consider the situation as a whole, including the context in which the testimony was offered." *Barnes*, 2023 UT App 148, ¶ 24. "Because other evidence may support testimony that would otherwise be considered improbable on its own, . . . testimony will generally be disregarded only when no corroborating evidence exists." *State v. Jok*, 2021 UT 35, ¶ 31, 493 P.3d 665. The inherent improbability standard generally is not satisfied by "the mere existence of a conflict in the evidence." *In re S.M.*, 2024 UT App 135, ¶ 33 (cleaned up). "Nor is this standard satisfied where the appellant raises garden-variety credibility questions, such as which witness to believe, or which version of a witness's conflicting account to believe." *Id.* (cleaned up).

¶34　However, "there are three hallmarks of inherently improbable testimony that courts have often considered in their analysis: material inconsistencies, patent falsehoods, and lack of corroborating evidence." *Barnes*, 2023 UT App 148, ¶ 24 (cleaned up). "But while these three [hallmarks] are beneficial, they are not controlling." *In re S.M.*, 2024 UT App 135, ¶ 32 (cleaned up). "The ultimate question in an inherent improbability analysis is whether the testimony of the witness runs so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *Id.* (cleaned up).

¶35 Hughes forwards four arguments for application of the inherent improbability doctrine here. Each is far from convincing.

¶36 First, Hughes contends that the whole of Mother's testimony is inherently improbable because Mother "was inconsistent regarding the involvement of a gun in the dispute." Specifically, he points to the contrast between Mother's statement to the dispatcher that she did not see a gun but thought Hughes might have one because "he told [her] he did" and her testimony at trial that she saw "the handle of a gun in [Hughes's] pants" when he pulled up his shirt and said he was prepared to "bang it out" with police. But this discrepancy does not amount to "material inconsistencies" that might trigger the inherent improbability doctrine.

¶37 The only Utah case in which a witness's testimony has been deemed inherently improbable based on material inconsistencies is *State v. Robbins*, 2009 UT 23, 210 P.3d 288. The witness in *Robbins* was a minor whose testimony contained "many inconsistencies" as well as "patently false statements . . . to cover up [those] inconsistencies"—including a "made up . . . story about a hearing problem"—and "no other evidence point[ed] to [the defendant's] guilt." *Id.* ¶¶ 1, 22, 23. In contrast, Hughes identifies a single discrepancy between Mother's various accounts of the incident, he identifies no testimony that was patently false, and other witnesses corroborated both Mother's testimonial narrative generally as well as her specific testimony bearing on the elements of the crimes for which Hughes was convicted. In short, Hughes has not shown that Mother's testimony was inherently improbable; he has identified a garden-variety credibility question regarding Mother's divergent accounts of whether she actually saw a gun.

¶38 Second, Hughes asserts that Oldest Daughter's and Middle Daughter's "CJC video interviews were credible, making their trial testimony inherently improbable." However, the fact that

Oldest Daughter and Middle Daughter related in their CJC interviews that they did not remember or recognize anything problematic about Hughes's visit to the hotel room and then testified differently at trial does not make their trial testimony inherently improbable. In *State v. Prater*, 2017 UT 13, 392 P.3d 398, "three witnesses gave pre-trial statements that conflicted with their trial testimony." *Id.* ¶ 37. Yet our supreme court held that those inconsistencies "by themselves [were] insufficient to invoke the inherent improbability exception." *Id.* ¶ 39 (cleaned up). The court pointed to the fact that "each witness admitted at trial that he or she initially lied to police" and that each witness provided at trial a plausible explanation consistent with "human experience" for why he or she initially lied to police. *Id.* Similarly here, Oldest Daughter and Middle Daughter each acknowledged the discrepancy between her CJC interview and her trial testimony. And their respective explanations that they were uncomfortable and not ready to talk to the CJC interviewer about the discord they witnessed were plausible and consistent with human experience, especially considering the girls' ages. Thus, we conclude here that "[t]he question of which version of [their] stories was more credible [was] the type of question we routinely require juries to answer." *Id.*

¶39    Third, Hughes suggests that Mother's, Oldest Daughter's, and Middle Daughter's testimony was inherently improbable because "[t]he custody dispute between [Mother] and Hughes provided a motivation for [Mother] and the daughters to accuse Hughes of crimes he did not commit." In support of this apparent assertion, Hughes observes that the *Robbins* case arose in the context of a custody dispute, *see* 2009 UT 23, ¶ 24, that the trial court in *Robbins* recognized that "there is nothing more emotionally driven than divorce proceedings involving children and custody," *id.* (cleaned up), and that our supreme court in *State v. Jok*, 2021 UT 35, 493 P.3d 665, said that a witness in *Robbins* "likely had motivation to lie because of the hostility that existed between her divorced parents," *id.* ¶ 34. In short, Hughes suggests

that a witness's motive to lie ought to be included in an inherent improbability analysis and that Mother and the daughters had a motive to lie. While we cannot say that Hughes is wrong as a categorical matter about including a witness's motive to lie in an inherent improbability analysis, *see State v. Barnes*, 2023 UT App 148, ¶ 24, 542 P.3d 108 (stating that when analyzing a claim of inherent improbability, "courts are to consider the situation as a whole"), *cert. denied*, 544 P.3d 459 (Utah 2024), Mother's and the daughters' motives to lie do nothing to move the needle in our analysis here. Ordinarily, whether a witness's motive to lie produced false testimony is a question for the finder of fact. *See Prater*, 2017 UT 13, ¶ 41 ("Whether a witness testifies truthfully in light of favorable treatment offered by the State goes to the weight and credibility of the testimony."). "And we will not act as a second trier of fact." *Id.*

¶40 Finally, Hughes asserts simply that "a reasonable jury could not have credited the inconsistent testimony from [Mother] and the daughters over the testimony from Hughes and [Son]," and he follows this assertion with nothing more than a cursory summary of his and Son's testimony. Merely identifying a conflict in the evidence is wholly insufficient to establish that the evidence with which one disagrees is inherently improbable. *See State v. Workman*, 852 P.2d 981, 984 (Utah 1993) ("When the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence."). Hughes's final argument therefore also does nothing to move the needle in our inherent improbability analysis here.

¶41 For the foregoing reasons, we reject Hughes's inherent improbability argument and include the whole of the evidence admitted at trial as we consider whether Hughes's convictions were supported by sufficient evidence. And because Hughes contends that only his conviction of domestic violence in the presence of Son was unsupported by sufficient evidence when the

challenged evidence is included in the sufficiency-of-the-evidence analysis, we determine that Hughes's other convictions were supported by sufficient evidence. We now turn to the question of whether in light of all the evidence admitted at trial, there was sufficient evidence to support Hughes's conviction of domestic violence in the presence of Son.

B.     Sufficiency

¶42    "In considering an insufficiency-of-evidence claim, an appellate court will not reverse a jury verdict provided it can conclude that some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *State v. Rivera*, 2019 UT App 188, ¶ 28, 455 P.3d 112 (cleaned up), *cert. denied*, 458 P.3d 749 (Utah 2020). To prove the crime of domestic violence in the presence of a child, the State must establish that a domestic violence offense occurred and that it occurred in the presence of a child. *See* Utah Code § 76-5-114.[3] Hughes's convictions of criminal trespass, sexual battery, and unlawful detention each qualify as domestic violence offenses. *See id.* § 77-36-1(4). And "'[i]n the presence of a child' means . . . in the physical presence of a child . . . or . . . having knowledge that a child is present and may see or hear an act of domestic violence." *Id.* § 76-5-114(1)(a)(iv).

¶43    Hughes contends that there was insufficient evidence that his crimes of domestic violence occurred in the presence of Son because Son's "clear and firm testimony that he did not observe or hear any domestic violence constitutes reasonable doubt as a matter of law." However, Son acknowledged that he arrived at and entered the hotel room with Hughes, that he remained in the

---

3. The content of this section was renumbered without material change after the offense in this case. *Compare* Utah Code § 76-5-114, *with id.* § 76-5-109.1 (2019). We cite the current version for convenience.

room during the relevant time, and that he could hear Mother and Hughes's interactions in both the room and the hallway. This evidence and reasonable inferences that can be drawn from it provide ample basis for a finding that Hughes knew Son was present and might see or hear the crimes of domestic violence of which Hughes was convicted. *See State v. Diviney*, 2021 UT App 106, ¶¶ 21, 23, 500 P.3d 883 (concluding that there was sufficient evidence of domestic violence in the presence of a possibly sleeping child where the defendant did not dispute that he knew the child was there and the victim of domestic violence testified that "even with [the child's bedroom] door closed, one could hear what was happening in other parts of the apartment"), *cert. denied*, 505 P.3d 55 (Utah 2022). We therefore reject Hughes's challenge to the sufficiency of the evidence as it relates to the charge of domestic violence in the presence of Son.

## II. Ineffective Assistance of Counsel

¶44    Hughes also contends that he received ineffective assistance of counsel because Counsel introduced at trial the entire recording of Mother's report to the police dispatcher, including her reference to "a standing order, mutual restraining order" between Hughes and Mother. We disagree.

¶45    "To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) 'counsel's performance was deficient' and (2) 'the deficient performance prejudiced the defense.'" *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)), *cert. denied*, 540 P.3d 78 (Utah 2023). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *Id.* (cleaned up). Hughes's ineffective assistance claim fails the second element of the test.

¶46    Under the second element of the ineffective assistance of counsel test, the appellant must show that defense counsel's deficient performance prejudiced the defense by "depriv[ing] the

defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Deficient performance is prejudicial when it creates "a reasonable probability that the outcome of . . . [the] case would have been different absent counsel's error." *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350.

¶47 Hughes contends that Counsel's failure to redact Mother's reference to "a standing order, mutual restraining order" from the recording of Mother's report before playing it for the jury prejudiced his defense for four reasons: (1) the evidence against Hughes was weak; (2) existence of the mutual restraining order "carrie[d] an implication of previous abuse"; (3) existence of the mutual restraining order "provided the jury with a reason that Hughes should be punished," regardless of whether he had committed the crimes charged; and (4) existence of the mutual restraining order "conflicted with Hughes's testimony that he and [Mother] were still speaking to each other and even considering reconciliation" at the time of the hotel incident. We are unconvinced.

¶48 First, Hughes is mistaken in asserting that the evidence against him was weak. Mother, Oldest Daughter, Middle Daughter, and Manager provided mutually corroborating testimony from which the jury could conclude that Hughes held Mother against a wall against her will, groped her breast and buttocks, and refused to leave when asked. That Hughes and Son testified to a different version of those events does not mean that the evidence against Hughes was weak.

¶49 Second, the existence of a mutual restraining order did not necessarily imply previous abuse. For one thing, because the restraining order was *mutual*, the jury might easily have believed that it was put in place for reasons other than abuse. And Hughes himself testified to a history of discord between himself and Mother, to which the jury would most likely have attributed the need for a mutual restraining order.

¶50   Third, the gravity of the charges for which Hughes was convicted—sexual battery, unlawful detention, and criminal trespass—substantially outweighs the gravity of merely being in a room from which one is proscribed from being. We therefore believe there is no reasonable likelihood that a jury otherwise unconvinced of a defendant's guilt would nevertheless return a verdict against him on these charges merely to punish him for being where he should not have been.

¶51   As to Hughes's final point, we acknowledge that the existence of a mutual restraining order might be viewed as conflicting with his testimony that he and Mother were on speaking terms and lent credibility to Mother's testimony that she did not want to talk to Hughes or have him in the hotel room. However, the daughters' testimony about Mother crying and repeatedly asking Hughes to leave, as well as Manager's testimony that Mother did not want Hughes to be there, already corroborated Mother's testimony on this point to such an extent that we believe there is no reasonable probability of a different outcome for Hughes had the jury not heard a fleeting reference to a mutual restraining order.

¶52   For the foregoing reasons, we conclude that Hughes has not satisfied the prejudice element of his ineffective assistance of counsel claim, and we therefore reject that claim.

CONCLUSION

¶53   As to Hughes's challenge to the sufficiency of the evidence, we conclude that Mother's, Oldest Daughter's, and Middle Daughter's testimony was not inherently improbable and that the evidence at trial, including that testimony, was sufficient to support each of Hughes's convictions. As to Hughes's ineffective assistance of counsel claim, we determine that any deficient performance on the part of Counsel did not prejudice Hughes's defense. For these reasons, we affirm Hughes's convictions.

_____