**2025 UT App 90**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ALBERTO FRANK HERNANDEZ,
Appellant.

Opinion
No. 20231047-CA
Filed June 12, 2025

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 221903825

Erick Grange, Attorney for Appellant

Derek E. Brown and Connor Nelson,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

MORTENSEN, Judge:

¶1 Alberto Frank Hernandez went to the tow yard to retrieve his impounded vehicle. An argument soon ensued with a tow yard employee. After threatening to physically harm the employee, Hernandez pulled out an airsoft gun to frighten him. Hernandez's sister, who had accompanied him, left the scene with the gun. When the police interviewed Hernandez, he insisted that he never had any sort of firearm, but he later admitted that his initial statement had been a lie. Hernandez was eventually convicted of aggravated assault and obstruction of justice. He now appeals, arguing that insufficient evidence supported the charges. We affirm the convictions.

## BACKGROUND[1]

¶2    Hernandez was charged with aggravated assault and obstruction of justice for his actions during a confrontation with a tow yard employee (Employee).

¶3    Employee, who testified at trial, explained that Hernandez was among a group of customers waiting at the tow yard to get their impounded vehicles released but that Hernandez was "not happy and very upset about the whole situation." Employee said that before he could get out of his truck and open the gate, Hernandez approached him, "very upset and very angry" and uttering numerous obscenities. Employee characterized the encounter as a "terrifying experience from the beginning." As Employee opened the gate to the tow yard, Hernandez attempted to enter, but Employee asked him to wait outside on a nearby sidewalk. At this point, Hernandez "pull[ed] out [a] gun from his waist." Employee testified that Hernandez "threaten[ed]" him with the gun, which he described as a black 9mm, pointing it at him for "[a]bout a minute." Employee testified that he was "shaking," "couldn't think straight," and "was terrified through the whole experience." He added that he felt like his life was "coming to an end" and remembered thinking that his life was "worth more than that vehicle that was in the impound lot." After Hernandez lowered the gun, Employee retreated to the tow yard office, where he locked himself in and called the police. Meanwhile, Hernandez remained outside screaming and swearing. Employee said that while he was waiting for the police to arrive, a woman who was with Hernandez ran toward

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

Hernandez, "grabbed the gun from him, and took off" in her vehicle.

¶4      Police then arrived on the scene. One officer (First Officer) testified that Hernandez said "he had a large thermos . . . around his waistband" when he "got in an altercation" with Employee. Hernandez said he "removed the thermos" as he got ready "to fight" with Employee. Police found a thermos sitting beside a safe in the area.[2] Inside the safe, after it was unlocked with Hernandez's consent, First Officer found some airsoft pellets. First Officer then asked Hernandez, "The firearm that you produced, was it a real one or was it a fake one?" Hernandez then admitted that he had a gun, saying, "It was an airsoft gun."[3] In addition, First Officer testified that "airsoft guns can look just like real guns." He further testified that when officers found the vehicle identified as having carried the gun away from the scene, no weapon of any kind was found.

¶5      Another officer (Second Officer) who had responded to the incident also spoke to Hernandez. Second Officer testified that Hernandez "mentioned many times that there was no gun

---

2. As far as we can glean from the record, the safe—which appears in a trial exhibit photograph to be portable and about the size of a small briefcase—was transported to the scene of the incident in the backseat of the vehicle that Hernandez used to get there. The photograph depicts the safe sitting next to a thermos just outside the tow yard gate, which is how they were situated when officers arrived.

3. Hernandez sometimes described the gun as a "BB gun." Elsewhere in the record and the briefing, the gun is referred to as an "airsoft gun." There is no reason to think that the parties are referring to different weapons. First Officer stated that he believed an airsoft gun "can either shoot metal like a BB gun . . . or it can shoot hard plastic pellets."

involved," that "he didn't understand why anybody there . . . would say there was a gun involved because there wasn't," and that he didn't "own guns [or] have guns." Second Officer said the safe was locked and the keys were found on Hernandez. After obtaining Hernandez's permission to open the safe, officers found airsoft pellets inside. It was at this point that Hernandez admitted to having taken out the airsoft gun, but he claimed that he "didn't, like, point it at" anybody.[4] Second Officer also confirmed that airsoft guns are "easily mistaken for real guns," and he recalled telling Hernandez that if he were "to pull that out on an officer, . . . he would be shot."

¶6    Two tow yard customers also testified. The first customer (First Witness) testified that a man went through the gate when Employee opened it, prompting—in her perception—Employee "to yell at him to not come inside just yet." This led to the man and Employee "exchanging some words" and becoming "heated in their arguments." At this point, according to First Witness, the man "pull[ed] out his gun to the side." When asked what the man did with the gun, she responded, "So he took out the gun from his holster, and then he pointed to the right of his side. But he just had it pointed to the floor. He didn't have it pointed at a person." She thought the gun was real and said that "it was obvious it wasn't a toy." And when she saw the gun come out, First Witness left the area, retreating to the vehicle in which she arrived. However, she was still able to observe the altercation, which ended when Employee stepped back behind the gate and Hernandez holstered the gun and gave it to a woman who was with him; First Witness specifically noted that Hernandez took "off the holster and the gun, like [he] was taking off a belt, and then he handed everything

---

4. At trial, Second Officer's body camera video recording of his interaction with Hernandez was played for the jury. The contents of the video track the testimony of the two officers as recounted above.

to the lady." The woman then took the gun and left. First Witness estimated that Hernandez had the gun out for about five minutes.

¶7      The second customer (Second Witness) also testified about the encounter between Employee and Hernandez:

> [Employee] opened up the gate, and he started putting his tow truck in. And as he was putting his tow truck into park in front of the office, . . . [Hernandez] rushes in and tries to sneak in to try to take his car. And the dude notices [Hernandez], and he tries to prevent him from coming back in, and tells him to stop outside the gate because he's trespassing. And I guess, [Hernandez] was not taking no for an answer, so he started retaliating with demands of taking his car back.

¶8      Second Witness testified that the conversation between Hernandez and Employee was "getting pretty loud," with Hernandez "demanding to get his car" and Employee "telling him to stay behind the gate" and wait. Hernandez then said, "I'm going to fuck you up if you don't let me go through and get my stuff out of there and get my car out. You don't have a right to do whatever you want, to hold my car." Second Witness said his wife was getting scared as the quarrel continued, so he decided to take her back to their car. At this time, his wife exclaimed that Hernandez pulled out a gun, prompting Second Witness to turn around and watch. He noticed that Hernandez had the gun "on the side of his body," but he noted that he never saw the gun pointed at anyone. He believed the gun was real.

¶9      At the close of the State's case, Hernandez moved for a directed verdict.[5] However, the district court expressed a

_____

5. The trial transcript is not explicit that the motion was for a directed verdict. But given the context, it is clear that such was its nature. The parties agree on this point in their briefing.

preference to reserve the motion until after all the testimony was presented to the jury.

¶10    Hernandez then took the stand. He testified that at the tow yard he was being polite, even though Employee was "real confrontational." Hernandez said that he stepped out of the tow yard when Employee told him to do so but that he was provoked by the comments Employee made. Hernandez admitted that he "yell[ed] profanities" at Employee and told him, "I'll kick your ass." Hernandez said that at some point he pulled out an airsoft gun from his waistband and "held [it] to the side" in an effort to "scare" Employee and to "warn" Employee to not "come at" him. Hernandez insisted that he did not point the gun at anyone or have any intention to shoot.

¶11    Hernandez testified that his sister then approached him and said, "Give me the gun," and he did as she asked. But when asked why he surrendered his weapon to her, he said he "wasn't really thinking." However, he said he "figured" that he "might get in trouble," so he gave the gun to her when she asked for it. He insisted that it wasn't his "idea" to give the gun away, that he did not give his sister any instructions about what to do with the gun, and that he thought she was going to put it in her vehicle. After giving up his gun, Hernandez remained at the scene and waited for the police because he didn't feel like he'd done anything wrong: "I didn't hurt [anybody]. We didn't fight. There was no altercation. Nobody got hurt. Other than our feelings, nobody got hurt."

¶12    When asked why he brought the airsoft gun with him, Hernandez testified that he stored the gun in his waistband to keep his son from playing with it, explaining that his son could get into the safe because there were multiple keys and that his son had recently used the gun to shoot his older brother. Since that shooting incident, Hernandez asserted, he carried the gun with him at all times.

¶13    Hernandez testified that he initially told police that he didn't have a gun because he was "not too familiar with the gun laws" and he had "no idea if [he] was going to get in trouble." And when asked if he allowed his sister to take the gun and if he subsequently lied to the police about having the gun "to avoid getting into trouble," Hernandez responded in the affirmative.

¶14    After Hernandez testified, the district court invited his counsel to revisit the motion for a directed verdict. Trial counsel argued there was insufficient evidence for either aggravated assault or obstruction of justice.

¶15    For the aggravated assault charge, *see* Utah Code § 76-5-103(2) (stating that an "actor commits aggravated assault if . . . the actor makes a threat, accompanied by a show of immediate force or violence, to do bodily injury to another" and the conduct includes "the use of . . . a dangerous weapon"[6]), counsel argued that Employee was "the only witness who said that the gun was pointed at him" and that two witnesses contradicted "his testimony and [said] that the gun was never pointed at" Employee. Given this testimony, counsel asserted that there was nothing to "suggest that . . . Hernandez meant to shoot the gun, or that he meant to give [Employee] the impression by an immediate show of force that he meant to follow through with any kind of threat of using the gun."

¶16    For the obstruction charge, counsel argued that there was insufficient evidence under either theory advanced by the State. *See id.* § 76-8-306(2)(c), (j) (stating that "an actor commits

---

6. The aggravated assault statute defines a dangerous weapon as "any item capable of causing death or serious bodily injury; or . . . a facsimile or representation of the item, if . . . the actor's use or apparent intended use of the item leads the victim to reasonably believe the item is likely to cause death or serious bodily injury." Utah Code § 76-1-101.5(7); *see also id.* § 76-5-103(1)(b).

obstruction of justice in a criminal investigation or proceeding if the actor, with intent to hinder, delay, or prevent the investigation, . . . alters, destroys, conceals, or removes an item or other thing; [or] . . . provides false information regarding a suspect, a witness, the conduct constituting an offense, or any other material aspect of the investigation"). More specifically, counsel asserted that there was insufficient evidence that Hernandez attempted to remove the gun from the scene because his sister was the one who "took it and drove away" and "[n]one of the witnesses were aware of him giving her any instructions about what to do with it." And as far as withholding information or being untruthful about the investigation, counsel argued that Hernandez "ultimately told the truth" about having a gun rather than just a thermos.

¶17    The State opposed the motion, arguing that the "show of force" was "simply the drawing of the weapon" and that "whether he pointed" the weapon didn't really matter given that he was already angry with, yelling at, and threatening Employee. The State asserted that "the effect of that action of just pulling out the gun in that context [was] inherently threatening." As for obstruction, the State argued that Hernandez "cooperated in handing over" his gun to his sister and that a reasonable inference of her immediate departure from the scene was that Hernandez did so "to get rid of the gun and prevent [it] from coming to light." Moreover, the State argued that Hernandez lied about using a gun and didn't tell the truth until "he was caught out a little bit" when the airsoft pellets were discovered inside the safe.

¶18    The district court denied the motion. As to aggravated assault, the court ruled that there was "sufficient evidence" through "witness testimony" of "verbal threats [being] made in addition to the use of the firearm." And as to obstruction of justice, the court ruled there was "believable evidence" for "both of the alternatives . . . being put forward by the State."

¶19 The jury found Hernandez guilty of aggravated assault and obstruction of justice.

ISSUE AND STANDARD OF REVIEW

¶20 Hernandez appeals, raising a single issue for our review. He asserts that the district court erred when it denied his motion for a directed verdict regarding sufficiency of the evidence on both charges. "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168. And "we will uphold a trial court's denial of a motion for directed verdict based on a claim of insufficiency of the evidence if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Samora*, 2021 UT App 29, ¶ 20, 484 P.3d 1206 (cleaned up), *aff'd*, 2023 UT 5, 529 P.3d 330. Moreover, "for a sufficiency of the evidence challenge, we will reverse the fact finder's verdict only when the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Hughes*, 2024 UT App 168, ¶ 26, 560 P.3d 188 (cleaned up), *cert. denied*, 564 P.3d 957 (Utah 2025).

ANALYSIS

¶21 Hernandez argues that insufficient evidence existed to support a conviction of aggravated assault or obstruction of justice. We address each claim in turn.

I. Aggravated Assault

¶22 Hernandez first asserts that the court erred in denying his directed verdict motion related to insufficiency of the evidence to

support the aggravated assault charge. Specifically, Hernandez points out that aggravated assault requires "a threat, accompanied by a show of immediate force or violence, to do bodily injury to another." *See* Utah Code § 76-5-103(2)(a)(ii). He asserts that the gun "in this case was never pointed at Employee." Hernandez supports this assertion by focusing on the testimony of the two customers, one of whom said the gun was pointed at the ground, while the other stated that he never saw the gun pointed at anyone. And Hernandez also turns to his own assertions that he never pointed the gun at anybody. The only testimony that Hernandez pointed the gun at Employee came from Employee, but Hernandez says Employee's "testimony was inherently improbable and his credibility at trial was not substantially reliable" because (1) his testimony contradicted the testimony of the other customers and Hernandez and (2) Employee had prior felony convictions for crimes involving untruthfulness (namely, impersonating a police officer and theft by deception). Given this contradiction and credibility issue, Hernandez concludes that Employee's testimony about the gun being pointed at him was "incredibly dubious and, as such, apparently false." (Quoting *State v. Robbins*, 2009 UT 23, ¶ 18, 210 P.3d 288.) Hernandez asserts that with the gun drawn only to his side and pointed at the ground, there was no show of the immediate force necessary to support the charge of aggravated assault. Without the "inherently improbable" testimony from Employee, Hernandez argues that there was insufficient evidence to establish that he threatened Employee with "a show of immediate force or violence." Accordingly, Hernandez asserts that "reasonable minds must have entertained a reasonable doubt" that the gun was pointed at Employee. *See State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94 ("We will reverse a jury conviction for insufficient evidence only when the evidence is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.").

¶23 We recently pointed out that "in situations like this one, our analysis has two parts." *State v. Mayorga*, 2024 UT App 182, ¶ 27, 561 P.3d 1184 (cleaned up), *cert. denied*, 568 P.3d 261 (Utah 2025). The first part is to "analyze the evidence that the movant claims is inherently improbable," determining "whether the challenged piece of evidence is of such a poor quality that it should be disregarded." *Id.* (cleaned up). Answering "this question will dictate the dimensions of the universe of evidence that may be considered in the ensuing sufficiency-of-the-evidence analysis." *Id.* (cleaned up). The second step is the sufficiency analysis itself, in which we address "all evidence that has not been excluded from consideration on grounds of inherent improbability." *Id.* ¶ 28. This means that if we determine that the challenged evidence is inherently improbable, then it's excluded from the sufficiency analysis, but if the challenged testimony is not inherently improbable, then it is included in our analysis to determine whether "some evidence exists that could support the verdict." *State v. Skinner*, 2020 UT App 3, ¶ 25, 457 P.3d 421 (cleaned up).

¶24 Here, Hernandez's inherent probability claim under *State v. Robbins*, 2009 UT 23, 210 P.3d 288, fails for lack of preservation. This is the entirety of Hernandez's motion for a directed verdict on the aggravated assault charge:

> [T]he State has not presented a prima facie case for aggravated assault. There has been extensive evidence that [Hernandez] and [Employee] were arguing. But [Employee] is the only witness who said that the gun was pointed at him, and we have two other witnesses who contradict his testimony and say that the gun was never pointed at [him]. [Second Witness] said it seemed clear to him that [Hernandez] was not going [to] use that weapon. No witnesses other than [Employee] mentioned any kind of immediate show of force. I think the only

> thing that [Employee] mentioned that could be considered an immediate show of force is just pointing the gun. Nobody else mentioned any details that would suggest that [Hernandez] meant to shoot the gun, or that he meant to give [Employee] the impression by an immediate show of force that he meant to follow through with any kind of threat of using the gun.

Notably missing from this motion is an allegation that Employee's testimony was inherently improbable—as that term is understood under Utah precedent. The directed verdict motion did not assert that Employee's testimony should be wholly disregarded; instead, the motion went to the weight of the totality of the evidence. Thus, the motion represents a "generalized challenge to the sufficiency of the State's evidence" that does not include any discernable assertion that Employee's testimony was inherently improbable. *Skinner*, 2020 UT App 3, ¶ 25. We have been clear that a *Robbins* inherent improbability claim "raises a whole new legal theory," *id.* ¶ 26 (cleaned up); *see also State v. Doyle*, 2018 UT App 239, ¶ 19, 437 P.3d 1266 ("[The contention on appeal] introduces a new legal theory: that the insufficiency should be reviewed only *after* [a witness's] testimony is ignored as 'inherently improbable.'"), that "is subject to a separate preservation requirement," *Mayorga*, 2024 UT App 182, ¶ 29. "To preserve any issue for appellate review, the issue must be *specifically* raised such that the issue was sufficiently raised to a level of consciousness before the trial court." *Id.* (cleaned up). And in the context of inherent improbability, we have repeatedly clarified that a "defendant who wants a trial court to disregard a witness's testimony under *Robbins* before, or in connection with, undertaking a sufficiency-of-the-evidence review must make that request known to the trial court so that the court has an opportunity to rule on the issue." *Skinner*, 2020 UT App 3, ¶ 29.

¶25 That's not what happened here. The inherent improbability doctrine is undetectable in Hernandez's directed verdict motion. At most, Hernandez "argued that the State's evidence was insufficient to convict him." *Mayorga*, 2024 UT App 182, ¶ 30. But Hernandez never raised a "*Robbins* claim with regard to [Employee's] testimony: at no point did he assert that [Employee's] testimony should be disregarded in an insufficiency analysis due to inherent improbability, and at no point did he cite *Robbins* or any subsequent similar case law." *Mayorga*, 2024 UT App 182, ¶ 30. Accordingly, we conclude that "this particular challenge was not presented to the trial court and was not preserved for appeal." *Doyle*, 2018 UT App 239, ¶ 19.[7]

¶26 Thus, we are left with Hernandez's general insufficiency challenge to the denial of his directed verdict motion. Because Hernandez's inherent improbability challenge fails for lack of preservation, we consider Employee's testimony as "proper evidence for purposes of our sufficiency analysis." *See Mayorga*, 2024 UT App 182, ¶ 35. In other words, "the universe of evidence to be considered in our analysis includes [Employee's] testimony as well as all other evidence presented at trial." *See id.* (cleaned up); *see also State v. Hughes*, 2024 UT App 168, ¶ 41, 560 P.3d 188 ("We now turn to the question of whether in light of all the evidence admitted at trial, there was sufficient evidence to support [the] conviction . . . ."), *cert. denied*, 564 P.3d 957 (Utah 2025). "And with that universe of evidence in mind, there is

---

7. Hernandez has not asked us to apply any of the exceptions to the preservation rule (namely, plain error, ineffective assistance of counsel, or exceptional circumstances). "Accordingly, we do not reach the merits of [Hernandez's] *Robbins* claim" under an established exception to preservation. *See State v. Mayorga*, 2024 UT App 182, ¶ 34, 561 P.3d 1184, *cert. denied*, 568 P.3d 261 (Utah 2025).

clearly enough evidence to support" Hernandez's conviction for aggravated assault. *See Mayorga*, 2024 UT App 182, ¶ 36.

¶27    "In considering an insufficiency-of-evidence claim, an appellate court will not reverse a jury verdict provided it can conclude that some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *Hughes*, 2024 UT App 168, ¶ 42 (cleaned up). "A person commits aggravated assault . . . if he or she uses a dangerous weapon and intentionally, knowingly, or recklessly makes a threat, accompanied by a show of immediate force or violence, to do bodily injury to another." *State v. Brown*, 2025 UT App 31, ¶ 16, 566 P.3d 737 (cleaned up); *see also* Utah Code § 76-5-103(2)(a)(ii), (b)(i)(A) (defining aggravated assault in the context of using a dangerous weapon).

¶28    Here, there is ample evidence that Hernandez made a threat and a show of immediate force or violence against Employee. Hernandez admitted that he swore at Employee and told him that he was going to "kick [his] ass" before pulling out his airsoft gun in an effort to "warn" and "scare" Employee. And while Hernandez insisted that he did not point the gun at Employee or have any intention to shoot, Employee testified that Hernandez did point the gun at him. The jury could have chosen to believe Employee's testimony on this point. After all, the "jury is the exclusive judge of credibility," *see* Utah Code § 78B-1-128(4), and it could have credited Employee's recollection of the encounter even though the two other customers and Hernandez either could not corroborate or contradicted Employee's account. Indeed, "when the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given to particular evidence." *State v. Black*, 2015 UT App 30, ¶ 19, 344 P.3d 644 (cleaned up); *see also State v. Rivera*, 2019 UT App 188, ¶ 21, 455 P.3d 112 ("The choice between conflicting testimony is within the province of the jury." (cleaned up)). As an appellate court, "we are not normally in the

business of reassessing or reweighing evidence"; instead, "we resolve conflicts in the evidence in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (cleaned up). Accordingly, since there was "some evidence . . . from which a reasonable jury could find that the elements" of aggravated assault have been proved "beyond a reasonable doubt," Hernandez's first claim of error fails. *See Hughes*, 2024 UT App 168, ¶ 42 (cleaned up).[8]

## II. Obstruction of Justice

¶29 Hernandez next argues that the district court erred in denying his directed verdict motion in which he asserted that insufficient evidence supported the obstruction of justice charge under either theory advanced by the State.

### A. Removing the Gun

¶30 First, Hernandez argues that there was no evidence that he "removed the alleged gun from the scene with intent to hinder, delay, or prevent an investigation because he did not know what his sister would do with it." Instead, Hernandez claims that his "sister removed the alleged gun from the scene and no evidence shows that Hernandez told her to get rid of it, hide it, or do anything with it." Given this circumstance, Hernandez argues that he never concealed or removed the gun with the intent of hindering the investigation. *See* Utah Code § 76-8-306(2)(c) (defining "obstruction of justice" as concealing or removing an item "with intent to hinder, delay, or prevent" an investigation). More specifically, because "obstruction of justice requires proof of both a general culpable mental state as to conduct *and* the specific intent to cause a result," *State v. Vigil*, 2019 UT App 131, ¶ 13, 448

---

8. Given our resolution of this issue, we do not need to address whether drawing the gun but not pointing it at anyone was sufficient to support the conviction for aggravated assault.

P.3d 738, Hernandez argues that the evidence fell short of supporting his conviction.

¶31 Ample evidence shows that Hernandez intended to remove the gun from the scene in order to prevent police from finding it. Our supreme court has explained,

> A defendant's mental state can be proven by circumstantial evidence, including the nature and extent of the criminal act. When the mental state is proven by circumstantial evidence, we examine whether the State presented any evidence that the defendant had the requisite intent or knowledge and whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that the defendant possessed the requisite intent.

*State v. Maestas*, 2012 UT 46, ¶ 179, 299 P.3d 892 (cleaned up).

¶32 Employee and First Witness testified that Hernandez transferred the gun to his sister. Employee said that the sister approached Hernandez and "grabbed the gun from him" and then left in her car. First Witness said that Hernandez put the gun in its holster and "handed everything" to his sister. And Hernandez himself said that he "figured" that he "might get in trouble" for using the gun, so he "gave it" to his sister when she approached him and told him to do so. From this evidence, the jury was certainly entitled to draw an inference that had "a basis in logic and reasonable human experience sufficient to prove" that Hernandez "possessed the requisite intent" to remove the gun from the scene in to order hinder the investigation. *See id.* (cleaned up). Hernandez clearly did not want to be holding the gun when the police arrived—after all, he conceded that doing so "might get [him] in trouble." The inference from all this is clear: he gave the gun to his sister to avoid being connected with it when the police arrived.

¶33    This inference that Hernandez caused the gun to be removed from the scene to cover up the fact that he used it during the altercation is further supported by the fact that Hernandez lied to the police about owning a gun. Second Officer testified that Hernandez "mentioned many times that there was no gun involved," that "he didn't understand why anybody there . . . would say there was a gun involved because there wasn't," and that he didn't "own guns [or] have guns." The inference here is obvious. Hernandez knew that he would "get in trouble" for using a gun, so he intended to tell the police that no gun was involved and express utter incredulity should anyone suggest otherwise. And this plan would surely not work if he was found possessing a gun, so he had to make sure it was nowhere to be found. His plan may not have been a good one given that Employee and the witnesses saw him draw the gun, but that doesn't mean the jury was unjustified in inferring that Hernandez intended to impede the investigation based on the evidence.[9]

¶34    In sum, ample evidence shows that Hernandez intended to obstruct justice by facilitating the removal of the gun from the scene.

B.    Providing False Information

¶35    Second, Hernandez argues that there was insufficient evidence to show that he "provided false information with intent to hinder, delay, or prevent an investigation because he ultimately told the police about the airsoft gun." Instead, he asserts that the evidence showed that even though he initially told police he had only pulled out his thermos, he "ultimately told the truth" that he

---

9. Hernandez also argues that it wasn't his idea to give the gun to his sister, that he didn't tell her what to do with it, and that he didn't know what she did with it. But these circumstances do not change the inference that Hernandez removed the gun from the scene so he would not be found with it when the police arrived.

had an airsoft gun and was thereafter compliant with officers. Given that he eventually came clean about the gun, Hernandez argues that there was insufficient evidence to prove that he intended to hinder the investigation. *See* Utah Code § 76-8-306(2)(j) (stating that "obstruction of justice" includes providing "false information regarding a suspect, a witness, the conduct constituting an offense, or any other material aspect of the investigation").

¶36  Once again, ample evidence supports that Hernandez obstructed justice—this time by providing false information regarding his conduct. There is no dispute that Hernandez initially lied to police when he told them he pulled out a thermos instead of a gun during the altercation. It was only after airsoft pellets were found inside the safe that Hernandez admitted to having pulled out a gun. This fabrication allowed the jury to infer that Hernandez provided false information in an effort to frustrate the investigation. That Hernandez "ultimately told the truth" about the gun is of little consequence in refuting the inference that the jury was inclined to draw from the evidence. After all, Hernandez likely saw the evidence arrayed against him—a safe with airsoft pellets in it and witnesses and Employee saying he had drawn a gun—and concluded that there was more to be lost than gained in maintaining the charade that he hadn't used a gun. Eventually telling the truth doesn't change the inference that Hernandez floated his story about not using a gun to see how it would go over. When he realized that the police did not buy his unlikely story about the thermos, he told the truth about using a gun. Even though he eventually told the truth, the fact remains that Hernandez didn't want to be associated with using a gun and he intentionally provided false information to prevent the police from finding out that he did. Accordingly, the evidence also proves that Hernandez intended to obstruct justice by lying to police.

CONCLUSION

¶37 Hernandez's claim of error fails. Sufficient evidence existed to support the charge of aggravated assault. And there was sufficient evidence to show that Hernandez intended to obstruct justice by causing the gun to be removed and by lying to the police.

¶38 Affirmed.

———————